1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

11
12
13
14
15

JUAN CARLOS CRUZ,

       Petitioner

     v.

KELLY SANTORO,

       Respondent.

Case No. 2:21-cv-08031-GJS

**MEMORANDUM OPINION AND ORDER**

16
17
18
19
20
21
22
23

    On October 7, 2021, Petitioner filed a habeas petition pursuant to 28 U.S.C. § 2254. [Dkt. 1, "Petition,"] On February 2, 2022, Respondent filed an Answer to the Petition [Dkt. 11] and lodged relevant portions of the state record [Dkt. 13, ("LD")]. Petitioner did not file a Reply, despite being granted an extension of time, and the time for doing so has passed. Thus, the matter is submitted and ready for decision.[1]

24

**PRIOR STATE PROCEEDINGS**

25
26
27

    On October 18, 2019, in Case No. TA144805, a Los Angeles County Superior Court jury found Petitioner guilty of the crimes of second degree murder and

28

---

[1]    Pursuant to 28 U.S.C. § 636(c), both parties have consented to proceed before the undersigned Unites States Magistrate Judge. [Dkt. 11.]

1    shooting at an occupied motor vehicle.  In connection with both charges, the jury

2    found various firearm allegations to be true.  [LD 1, Clerk's Transcript ("CT") 227-

3    28, 241-43.]  Subsequently, Petitioner was sentenced to state prison for a total term

4    of 40 years to life.  [CT 260-62, 264.]

5    Petitioner appealed his conviction and raised his present federal habeas claim,

6    which alleges instructional error.  [CT 263; LD 3, 5.]  On April 29, 2021, in a

7    reasoned decision, the California Court of Appeal affirmed Petitioner's judgment of

8    conviction, although it modified the judgment to correct the presentence custody

9    credits amount.  [LD 6.]

10   Petitioner then filed a petition for review with the California Supreme Court,

11   again raising his instructional error claim.  [LD 7.]  On July 14, 2021, the California

12   Supreme Court denied review without comment or citation to authority.  [LD 8.]

13

14                         **SUMMARY OF THE EVIDENCE AT TRIAL**

15   The Court has reviewed the record in this case, as well as the California Court

16   of Appeal's summary of the evidence in its unpublished opinion.  The California

17   Court of Appeal's summary is consistent with the Court's independent review of the

18   record.  Accordingly, the Court has quoted it below to provide an initial factual

19   overview.  The relevant portions of the trial record will be discussed further in

20   connection with the Court's analysis of Petitioner's claims.[2]

21

22                         **FACTUAL AND PROCEDURAL BACKGROUND**

23                         **I. [Petitioner's] Prior Relationship with the Victim**

24                               The victim in this case was Arturo Villanueva San

25                         Vicente.  [Petitioner] and Villanueva became friends

26   _____

27   [2]      On federal habeas review, "a determination of a factual issue made by a State court shall
     be presumed to be correct" unless rebutted by the petitioner by clear and convincing evidence.  28

28   U.S.C. § 2254(e)(1); *see also Schriro v. Landrigan*, 550 U.S. 465, 473-74 (2007).  Petitioner has
     not rebutted the state appellate court's summary of the evidence presented at trial.

                                             2

after working together at a car wash.  While hanging out with [Petitioner], Villanueva met [Petitioner's] wife, Jennifer Perez, and they also became friends.  At some point, Villanueva began suggesting to Perez that [Petitioner] was cheating on her.  Perez initially did not believe him.  However, in April 2017, Perez became upset at [Petitioner] because he was flirting with a friend that Perez had invited to their home.  When [Petitioner] left with Perez's friend and did not return home until later that night, Perez believed he was having an affair.

On April 8, 2017, Perez began a four-month affair with Villanueva as revenge against [Petitioner]. On the day the affair started, Villanueva posted on his Instagram account a picture of a hand holding a gun with the statement "[a] short one for the ones 'm against."  The post included the hashtag "Juanito," which was [Petitioner's] nickname.  When Villanueva showed the post to Perez, he said he wanted to prove he was not afraid of [Petitioner] and to see if [Petitioner] would confront him.  Villanueva's Facebook profile also had a picture of him with a rifle.

According to Perez, Villanueva became obsessed with her over the course of their affair.  He repeatedly asked her to leave [Petitioner] and run away with him to Mexico.  He began checking [Petitioner's] location on social media platforms, and he once showed up at Perez's home when he thought [Petitioner] was not there. Although Perez told him to leave, Villanueva refused and said he would "start doing drama" if she did not come outside.  He also said he was not afraid of [Petitioner] and would not mind facing him if [Petitioner] came home. On another occasion, Villanueva told Perez, "[I]f you don't leave with me in a good way, you're going to leave with me in a bad way."  He then slashed Perez's bedroom window screen.

Starting in July 2017, Villanueva began making threats to Perez about killing [Petitioner].  He told Perez he would "get rid of" [Petitioner] because "that's what it was going to take" for her to leave him.  He also said he would get a gun from his friend, Jonathan Castro, who was in a gang and was willing to help him kill [Petitioner].  Villanueva told Perez "all it takes is one," which she understood to mean "one gunshot to remove" [Petitioner].  By early August, Perez was fearful because Villanueva was talking more about killing [Petitioner]

and leaving with Perez to Mexico. Villanueva made clear to Perez that he was willing to get rid of [Petitioner] so that they could be together, and he was angry when Perez refused to leave her husband for him.

Perez told her friend, Estefany Merino, about her affair with Villanueva. On a few occasions, Perez also asked Merino to accompany her on dates with Villanueva so that Merino could act as a cover for Perez in case anyone she knew saw them together. Although Perez told Merino that Villanueva had twice threatened to "kill or get rid" of [Petitioner], Merino did not consider the threats to be "too serious." On one occasion, Villanueva called Merino and told her he wanted Perez to run away with him, and he wanted to get a gun from his friend so that he could get rid of [Petitioner]. In response, Merino warned Villanueva "not to do anything crazy," and to leave Perez alone because she would "never leave her family." The last time Merino went out with Perez and Villanueva, she heard Villanueva tell Perez that she needed to leave [Petitioner] and that he would kill him. At that point, Merino advised Perez that she should stop seeing Villanueva.

On August 4, 2017, Perez ended the affair with Villanueva because of his escalating threats and other behavior. On October 5, Villanueva changed his Facebook profile to a picture of him holding a rifle with the statement: "I went out with God. If I don't come back, it's because I left with him." The profile picture also showed a girl next to a truck stating "fuck your Ford." Perez believed Villanueva intended the picture to "trigger" [Petitioner], who drove a Ford Explorer at the time.

On November 13, 2017, Perez disclosed the affair to [Petitioner]. According to Perez, she confessed to [Petitioner] because Villanueva's threats had "started getting more intense." [Petitioner] initially was calm, but became angry at both Perez and Villanueva as Perez disclosed the details of the affair. When [Petitioner] asked Perez why she decided to tell him at that time, Perez said that Villanueva was making threats against him. In describing the threats to [Petitioner], Perez said Villanueva and Castro were setting [Petitioner] up to kill him, and Villanueva claimed he could get a gun from Castro to use against [Petitioner]. She also told [Petitioner] that Villanueva repeatedly said he was going

4

to kill [Petitioner] and had slashed their bedroom window screen.  After Perez told [Petitioner] about the affair, he was so angry that he did not want to see or talk to her. [Petitioner] was also worried about the threats and feared for his life and the lives of their young children, who might be with [Petitioner] if he were attacked.  Perez believed [Petitioner] stayed upset over the next several days and did not calm down.

## II. [Petitioner] Fatally Shoots Villanueva in His Vehicle

On the night of November 18, 2017, five days after Perez disclosed the affair, [Petitioner] fatally shot Villanueva while Villanueva was sitting inside his vehicle.  Earlier that evening, Villanueva had been with his good friend, Castro, a self-admitted gang member.[3] As Villanueva was driving Castro home, he mentioned he had dropped a container of medical marijuana inside his vehicle.  When they arrived at the apartment complex where Castro resided, they recognized [Petitioner's] truck parked in the driveway.  Villanueva parked his vehicle along the street.  Villanueva told Castro he was going to look for the container of marijuana he had dropped while driving.  As Castro was leaving the vehicle, Villanueva remained in the driver's seat.  He was turned toward his right, looking in the center console area.

Castro stopped on the sidewalk to talk to a neighbor.  While the men were having a conversation, [Petitioner] walked past them between two parked trucks. [Petitioner] did not say anything to the men, and instead continued walking toward the driver's side of Villanueva's vehicle.  Castro saw [Petitioner] open the driver's door and quickly fire multiple shots at Villanueva with a gun.  [Petitioner] then closed the door, walked toward the back of the vehicle, and made eye contact with Castro.  [Petitioner's] face showed panic, shock, and horror, but he did not speak.

Fearing for his life, Castro ran inside his apartment.  He told his girlfriend, Guadalupe Flores, that something had happened to Villanueva and asked her to

---

[3]    Footnote 2 in original:  "According to Castro, Villanueva had asked Castro to get him a gun because he was afraid of [Petitioner].  Castro did not own or possess a gun and did not obtain one for Villanueva."

check on him.  As Flores walked outside, she saw [Petitioner] get in his truck and drive away.  Flores approached Villanueva's vehicle and opened the passenger door.  Villanueva was slouched over the center console between the driver's and passenger seats.  His knees were on the driver's seat and his body was turned toward the back of the vehicle.  After calling 911, Flores opened the driver's door so that she could render aid to Villanueva.  At that time, Castro came back outside and helped Flores pull Villanueva out of the vehicle and onto the ground.  Responding paramedics were unable to revive Villanueva at the scene.

Villanueva died from multiple gunshot wounds. He sustained six gunshot wounds, four of which were fatal.  The pathway of each of the bullets was back to front, right to left, and downward in the victim.  The four fatal wounds were caused by bullets entering the back or right side of the body and exiting the front or left side. The two nonfatal wounds were due to bullets entering and exiting the back and right arm.

Surveillance video from an apartment building across the street did not capture the actual shooting. However, it showed that, prior to the shooting, Villanueva's vehicle slowed down as it passed in front of [Petitioner's] parked truck.  A short time later, two figures walked in succession from [Petitioner's] truck in the direction where Villanueva had parked his vehicle. After some time, one figure ran back to [Petitioner's] truck followed by a second figure who walked back to the truck.  A third figure, who appeared to be Castro, then walked toward the gate of the apartment complex. No weapon was found inside Villanueva's vehicle.

**III. [Petitioner's] Statement to the Police**

On November 30, 2017, [Petitioner] was arrested. In a recorded interview with the police, [Petitioner] initially denied he was present at the shooting.  When told he was captured on video at the scene of the shooting, [Petitioner] admitted that he and a friend named Lalo were standing nearby and heard gunshots, but denied he was involved.  Later in the interview, [Petitioner] admitted that he shot Villanueva.  [Petitioner] said he was high on drugs and felt his life was in danger because he had been told Villanueva wanted to kill him. [Petitioner] also said he felt threatened by Villanueva and

6

"[j]ust snapped." As described by [Petitioner], he went to the apartment complex to visit a friend and "[p]anicked" when he saw Villanueva pull up in his vehicle. Because Villanueva stayed inside the vehicle, [Petitioner] began to think Villanueva was going to shoot him so he "had to do what [he] had to do, before [he was] killed." [Petitioner] did not say anything to Villanueva. He "[j]ust walked up and shot him." [Petitioner] then panicked and left in his truck. He later got rid of the gun by tossing it into a lagoon.

**IV. [Petitioner's] Trial Testimony**

[Petitioner] testified on his own behalf at trial. According to his testimony, [Petitioner] was 28 years old at the time of trial, was married to Perez, and had three young children with her. He did not have any prior misdemeanor or felony convictions. As of 2017, [Petitioner] had known Villanueva for about five years and considered him to be a good friend. In April 2017, however, Villanueva suddenly stopped talking to him. In July, [Petitioner] saw Villanueva's Instagram post showing the picture of a gun with the hashtag "Juanito." Although [Petitioner] wondered about the meaning of the post, he did not perceive it as a threat at that time. In July, [Petitioner] left his job at the car wash and began working in a bakery. After changing jobs, [Petitioner] did not have any contact with Villanueva until the shooting.

In November 2017, about five days before the shooting, Perez told [Petitioner] she had an affair with Villanueva, and Villanueva was making threats against his life. [Petitioner] initially was shocked, but when Perez disclosed details of the affair, he understood why Villanueva had stopped talking to him. [Petitioner] also understood the meaning of Villanueva's social media post when Perez disclosed that Villanueva wanted to kill [Petitioner] and wanted Perez to run away with him. While Perez did not tell [Petitioner] if Villanueva had a gun, [Petitioner] knew Villanueva had access to guns through Castro. Perez's admissions made [Petitioner] feel hurt, angry, and worried. The affair was humiliating to [Petitioner]. He had friends in common with Villanueva and was embarrassed that they would know his wife had a sexual relationship with his friend. [Petitioner] was also worried because he believed Villanueva was serious about wanting to kill him. After

Perez told him about the threats, [Petitioner] began carrying a loaded revolver in his pocket for protection from Villanueva.

On the night of the shooting, [Petitioner] and Lalo went to the apartment complex to visit a friend named Alfredo. [Petitioner] had consumed alcohol, cocaine, and methamphetamine throughout the day. As [Petitioner] was standing on the sidewalk talking to the men, he noticed Villanueva's vehicle parked on the street. Castro got out of the vehicle and approached the group. He spoke to Alfredo but ignored [Petitioner]. [Petitioner] wondered why Villanueva had stayed inside the vehicle, and started to get worried and nervous. [Petitioner] decided to talk to Villanueva rather than leave. He believed that, even if he left at that time, "the problem [was] still going to be there," and he did not "want to be living [his] life looking over [his] shoulder." As he was walking toward the vehicle, [Petitioner] did not intend to shoot Villanueva, but only to speak with him.

[Petitioner] could not see inside Villanueva's vehicle because the windows were darkly tinted. The driver's door of the vehicle was slightly ajar. When [Petitioner] pulled the handle and opened the door, he saw Villanueva sitting in the driver's seat. Villanueva gave [Petitioner] an angry look and then quickly reached to his right and grabbed a gun from the center console area. In response, [Petitioner] pulled his own gun from his pocket, pointed it at Villanueva, and "shot him as fast as [he] could." [Petitioner] did not wait for Villanueva to point the gun at him because he did not want to get shot. While firing his weapon, [Petitioner] felt panic and fear for his life. At that moment, [Petitioner] believed he was going to die based on the look on Villanueva's face, his social media post, the fact that Villanueva had suddenly stopped talking to [Petitioner], and Perez's statements that Villanueva wanted to kill him. [Petitioner] would not have shot Villanueva if he did not think he saw a gun.

Immediately after the shooting, [Petitioner] was scared and in shock. He stood by the vehicle for a few seconds, then walked back to his truck. He decided to leave the scene because he thought the police would not believe him. [Petitioner] got rid of the gun after the shooting because he was afraid and did not want the weapon in his possession. Although [Petitioner] was under the influence of drugs and alcohol at the time of

the shooting, he denied that it caused him to fire his gun at Villanueva. [Petitioner] testified that the "[o]nly thing that caused [him] to shoot [Villanueva] was fear, that [Villanueva] was about to shoot [him]."

[LD 6 at 2-10.]

## PETITIONER'S HABEAS CLAIM

Petitioner used the standard Section 2254 petition form to commence this action. While Petitioner utilized all four portions of the form in which a petitioner is to state separate habeas claims as Ground One, Ground Two, Ground Three, and Ground Four, the Petition – read fairly and liberally and in the light of the single habeas claim actually raised and exhausted on state direct appeal – states only the following single ground for relief, albeit one supported by various arguments.

Petitioner contends that he was deprived of due process, because the trial court failed to instruct the jury, sua sponte, on the lesser included offense of voluntary manslaughter based on a heat of passion theory. Petitioner contends that a heat of passion instruction was warranted due to the victim's continuing provocations. Petitioner reasons that the failure to instruct the jury as to heat of passion-based voluntary manslaughter rendered the jury instructions incomplete as to the "malice" element of murder. Petitioner asserts that this instructional error cannot be found harmless, because had the instruction been given, the prosecution's burden of proof would have been elevated and the jury might have hung as a result.

## STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996, as amended ("AEDPA"), when the state court has rendered a decision on the merits, federal habeas relief is barred "unless one of two narrow exceptions set forth in 28 U.S.C. § 2254(d)(1) or (2) applies, which are the state court's decision was (1) contrary to, or involved an unreasonable application of, clearly established Federal

1  law, as determined by the Supreme Court, at the time the state court adjudicated the

2  claim, . . . or (2) based on an unreasonable determination of the facts in light of the

3  evidence presented in the State court proceeding." *Ochoa v. Davis*, 16 F.4th 1314,

4  1325 (9th Cir. 2021) (quoting Section 2254(d)(1) and (2); internal quotation marks

5  omitted); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (characterizing the

6  Section 2254(d) requirements as a "limit" and "restriction" on the power of federal

7  courts to grant habeas relief to state prisoners); *Harrington v. Richter*, 562 U.S. 86,

8  102 (2011) ("By its terms § 2254(d) bars relitigation of any claim 'adjudicated on

9  the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (2).").

10  The above AEDPA predicates for relief constitute a "highly deferential standard for

11  evaluating state-court rulings, which demands that state-court decisions be given the

12  benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (*per curiam*).

13       The California Court of Appeal considered the claim alleged in the Petition

14  on direct appeal and rejected it on its merits in a reasoned decision.  When Petitioner

15  raised the claim in the state high court, the California Supreme Court denied review

16  without comment.  Therefore, to undertake its Section 2254(d) analysis, the Court

17  must look to the last reasoned decision on the merits, namely, the California Court

18  of Appeal's decision on direct appeal.  *See Berghuis v. Thompkins*, 560 U.S. 370,

19  380 (2010) (when, on direct appeal, state court of appeal denied claims on their

20  merits in a reasoned decision and the state supreme court then denied discretionary

21  review, the "relevant state-court decision" under Section 2254(d) was the state court

22  of appeal decision); *see also Wilson v. Sellers*, 138 S. Ct. 1188, 1193-96 (2018)

23  (when a state high court issues a summary denial of relief following a reasoned

24  decision by a lower state court denying relief, the federal habeas court looks through

25  the summary denial to the lower court's reasoned decision for purposes of AEDPA

26  review, because it is presumed the state high court's decision rests on the grounds

27  articulated by the lower state court).

28

For purposes of Section 2254(d)(1),[4] the relevant "clearly established Federal law" consists of Supreme Court holdings (not dicta) applied in the same context that Petitioner seeks to apply it and existing at the time of the relevant state court decision. *See Lopez v. Smith*, 574 U.S. 1, 2, 4 (2014) (*per curiam*); *see also Greene v. Fisher*, 565 U.S. 34, 40 (2011). A state court acts "contrary to" clearly established Federal law if it applies a rule contradicting the relevant holdings or reaches a different conclusion on materially indistinguishable facts. *Price v. Vincent*, 538 U.S. 634, 640 (2003). A state court "unreasonably appli[es]" clearly established Federal law if it engages in an "objectively unreasonable" application of the correct governing legal rule to the facts at hand. Section 2254(d)(1), however, "does not require state courts to *extend* that precedent or license federal courts to treat the failure to do so as error." *White v. Woodall*, 572 U.S. 415, 134 S. Ct. 1697, 425-27 (2014). "And an 'unreasonable application of' [the Supreme Court's] holdings must be 'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice." *Id.* at 419 (citation omitted). "The question . . . is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold." *Landrigan*, 550 U.S. at 473.

For claims governed by the Section 2254(d) standard of review, federal habeas relief may not issue unless "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." *Richter*, 562 U.S. at 102. To obtain habeas relief, a petitioner "must show that" the state decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103. "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by

---

[4]   The Petition does not challenge any factual finding by the state courts, and as a result, Petitioner's claim does not implicate Section 2254(d)(2).

11

overturning their decisions only when there could be no reasonable dispute that they were wrong." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (*per curiam*); *see also Mays v. Hines*, 141 S. Ct. 1145, 1149 (2021) (per curiam) (for purposes of Section 2254(d) review, "[a]ll that mattered was whether the [state court] . . . still managed to blunder so badly that every fairminded jurist would disagree").  This standard is "difficult to meet," *Metrish v. Lancaster*, 569 U.S. 351, 358 (2013), as even a "strong case for relief does not mean the state court's contrary conclusion was unreasonable," *Richter*, 562 U.S. at 102.  "[S]o long as 'fairminded jurists could disagree' on the correctness of the state court's decision," habeas relief is precluded by Section 2254(d).  *Id*. at 101 (citation omitted); *see also Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2558 (2018) (*per curiam*) ("If such disagreement is possible, then the petitioner's claim must be denied.").  "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' … and 'demands that state-court decisions be given the benefit of the doubt.'"  *Renico v. Lett*, 559 U.S. 766, 773 (2010) (citations omitted).

## DISCUSSION

### I.     The Underlying State Court Proceedings

#### A.  Trial Court

In his opening argument, Petitioner's counsel told the jury that "[t]his is a case about -- about passion run amuck.  And when I say passion, I'm talking about the passion of [Petitioner].  I'm talking about the passions of [victim] Arturo Villanueva."  [LD 2, Reporter's Transcript ("RT") 698.]  Counsel then stated what he believed what the evidence would show, including that Petitioner approached Villanueva on the day in question simply wanting to talk and resolve things and only shot because he thought Villanueva had a gun.  Counsel asserted that, after hearing the evidence, the jury would find Petitioner not guilty of murder.  [RT 698-704.] Counsel did not argue that the shooting was a crime less than murder, such as

1   voluntary manslaughter, or that Petitioner acted in the heat of passion.  [*Id., passim*.]

2       Petitioner presented only two witnesses at trial, himself and Estefany Merino,

3   his wife's friend.  Petitioner's testimony has been summarized above and will be

4   discussed below.  In brief, Petitioner testified that he approached victim

5   Villanueva's car intending to talk to him and not to shoot him, but when Villanueva

6   appeared to reach for a gun, Petitioner panicked and, fearing for his own life, shot

7   Villanueva.  Ms. Merino's testimony has been accurately described by the

8   California Court of Appeal.  In brief, Ms. Merino testified about what Petitioner's

9   wife (Perez) told her about the affair with Villanueva and things that Villanueva had

10   said to Perez (including asking her to leave Petitioner and threats Villanueva made

11   about Petitioner), and why Perez broke off the affair (namely, because Villanueva

12   was acting aggressive and possessive).

13       Petitioner's counsel did not request that the jury be instructed on voluntary

14   manslaughter based on a heat of passion theory.  [CT 180-226; RT 2234-36.]  In

15   relevant part, the jury was instructed on:  the general principles of homicide [CT

16   204]; justifiable homicide based on self-defense [CT 205-06]; first or second degree

17   murder with malice aforethought [CT 208-09]; first degree murder [CT 210]; the

18   effect of provocation on murder, *i.e.*, that it could reduce a first degree murder to

19   second degree or murder to manslaughter [CT 211]; voluntary manslaughter based

20   on imperfect self-defense, as a lesser included offense [CT 212-13]; involuntary

21   manslaughter as a lesser included offense [CT 214-15]; and the effect of voluntary

22   intoxication on homicide crimes [CT 216, 222].

23       During closing argument, Petitioner's counsel again did not argue that the

24   killing of Villanueva was voluntary manslaughter based on a heat of passion theory,

25   nor did he ever suggest to the trial court earlier that he was pursuing any such

26   defense.  Rather, counsel commenced his closing argument by noting his earlier

27   reference to "passion sort of run amuck," which he described as "passion all over

28   the place" involving Petitioner, his wife, and Villanueva.  [RT 2455.]  Noting that

the prosecutor had charted out the possible verdicts of first or second degree murder or voluntary or involuntary manslaughter, Petitioner's counsel then described the differences between perfect self-defense and imperfect self-defense and said "that's what this case is about, right.  Is this self-defense or is it not?"  [RT 2458.] Throughout his argument, counsel reiterated that the issue before the jury was that Villanueva was armed and this was "self-defense," and that the prosecution had the burden of showing that this event was not self-defense.  [RT 2459, 2461, 2462-63, 2467, 2470, 2472, 2476-77.]

### B. The State Court Decision

The California Court of Appeal rejected Petitioner's federal habeas claim for three reasons.  First, the state appellate court found that, under California law:  if "'sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return, the killing is not voluntary manslaughter'"; to warrant a voluntary manslaughter instruction, "the killing must be 'upon a sudden quarrel or heat of passion' [citation]; that is, 'suddenly as a response to the provocation, and not belatedly as revenge or punishment'"; and accordingly, "it is not sufficient that a person 'is provoked and [then] later kills.'"  [LD 6 at 14; citations omitted.]  The state appellate court rejected Petitioner's argument that Villanueva's behavior that took place and threats made *before* Petitioner learned of the affair satisfied the above California law requirements, reasoning:

> Here, [Petitioner's wife, Perez, testified that Villanueva made repeated and escalating threats to kill [Petitioner] between July and August 2017.  Although Perez did not have any contact with Villanueva after she ended their affair in early August, she perceived Villanueva's October 5 Facebook post in which he posed with a rifle and made a derogatory remark about the type of vehicle that [Petitioner] drove as an additional attempt to "trigger" [Petitioner].  On November 13, Perez disclosed to [Petitioner] the affair and Villanueva's threats.  While [Petitioner] felt hurt, angry, and worried

upon learning of the affair and Villanueva's threats against his life, he did not take any immediate action in response to Perez's disclosures.  It was not until five days later, on November 18, that [Petitioner] decided to approach Villanueva when he saw Villanueva's vehicle parked on the street.  Because this five-day period was sufficient time for [Petitioner's] "passion to subside and reason to return," the evidence of Villanueva's prior threats of violence did not, standing alone, constitute legally sufficient provocation to warrant a voluntary manslaughter instruction.  (*People v. Beltran*, *supra*, 56 Cal.4th at p. 951; see *People v. Moye*, *supra*, 47 Cal.4th at p. 551 [voluntary manslaughter instruction not required where evidence of fight involving defendant and victim the evening before victim's deadly beating "did not itself constitute legally sufficient provocation"]; *People v. Pride* (1992) 3 Cal.4th 195, 250 [three-day gap between act of provocation and fatal stabbing of victim rendered provocation "insufficient as a matter of law to arouse feelings of homicidal rage or passion in an ordinarily reasonable person"]; *People v. McShane*, *supra*, 36 Cal.App.5th at p. 256 [defendant's altercation with victim four days before fatal shooting was not adequate provocation because "[f]our days was sufficient 'cooling time,' as a matter of law"].)

[LD 6 at 14-15.]

Second, the California Court of Appeal found that the events on the night of the shooting were not sufficient under California law to have warranted a heat of passion/voluntary manslaughter instruction.

[Petitioner] further asserts that, on the night of the shooting, he was provoked into killing Villanueva because he believed that Villanueva was prepared to kill him and that Villanueva might be armed with a gun. [Petitioner] notes that Perez testified she told him about Villanueva's plan to get a gun from his gang member friend, Castro, and to use it to "set [Petitioner] up and kill [him]."  [Petitioner] also notes that, while no gun was found in Villanueva's vehicle, Castro could have removed the weapon prior to the arrival of the police to avoid scrutiny into his own involvement in the shooting.

Yet, even assuming that [Petitioner] reasonably believed Villanueva was armed with a gun when he approached the vehicle, [Petitioner] was not entitled to an instruction on voluntary manslaughter under a heat of

15

passion theory.  Based on [Petitioner's] own trial testimony, immediately before the shooting he approached Villanueva's vehicle feeling worried or nervous, but with the rational intent of merely talking to Villanueva.  The only passion or intense emotion that [Petitioner] experienced occurred as he shot Villanueva because he feared for his own life and thought Villanueva was going to shoot him.  The jury was instructed both on justifiable homicide based on reasonable self-defense and voluntary manslaughter based on imperfect self-defense.  Under these circumstances, the trial court was not required to also instruct the jury on voluntary manslaughter based on heat of passion.

The California Supreme Court's decision in *People v. Moye*, *supra*, 47 Cal.4th 537, is instructive on this issue.  The defendant in *Moye* was convicted of second degree murder.  (*Id.* at p. 540.) The evidence showed he killed the victim during a confrontation that took place the morning after they had engaged in a fistfight. (*Id.* at pp. 542–554.)  According to the defendant's uncontested testimony, on the morning of the killing, the victim attacked him with a baseball bat after he approached the victim on the street and then chased him over a fence. (*Id.* at p. 552.)  The defendant fended off the attack by grabbing the bat from the victim and striking him with it in self-defense until the victim fell to the ground. (*Ibid.*) While the trial court instructed the jury both on justifiable homicide based on reasonable self-defense and voluntary manslaughter based on imperfect self-defense, it refused a defense request for an instruction on voluntary manslaughter based on heat of passion.  (*Id.* at p. 550.) On appeal, the Supreme Court concluded the trial court did not err in refusing to give a heat of passion instruction, stating:  The "thrust of defendant's testimony below was self-defense—both reasonable self-defense (a complete defense to the criminal charges), and unreasonable or imperfect self-defense (a partial defense that reduces murder to manslaughter).  There was insubstantial evidence at the close of the evidentiary phase to establish that defendant 'actually, subjectively, kill[ed] under the heat of passion.'"  (*Id.* at p. 554.) While the Supreme Court recognized there may be circumstances where instructions on both theories of manslaughter are warranted, it rejected any suggestion that a heat of passion instruction is required "in every case in which the only evidence of unreasonable self-defense is the circumstance that a defendant is attacked

16

and consequently fears for his life." (*Id.* at p. 555, italics omitted.)

In this case, [Petitioner] testified in unambiguous terms that the "[o]nly thing that caused [him] to shoot [Villanueva] was fear, that [Villanueva] was about to shoot [him]." [Petitioner] stated that, when he approached Villanueva's parked vehicle, he did not intend to kill Villanueva, but only "[t]o talk to him." However, once [Petitioner] opened the driver's door of the vehicle and saw Villanueva reach for a gun, [Petitioner] pulled out his own gun and "shot him as fast as [he] could." [Petitioner] stated that he shot Villanueva because he was "scared" and in "fear." At one point in his testimony, [Petitioner] stated that he felt "[p]anic" as he was firing the gun. However, he attributed his panic and fear at the time of the shooting to his belief that he was "going to die" given the presence of a gun, the look on Villanueva's face, and the prior threats that Villanueva had made against his life. [Petitioner] maintained that he would not have fired his weapon if he did not see Villanueva with a gun. [Petitioner] further testified that he knew it was "not right to take someone's life[,] [b]ut what is there to do when you're about to get your life taken?"

Accordingly, as in *Moye*, the thrust of [Petitioner's] testimony was that he acted in self-defense. [Petitioner] repeatedly testified that the reason he shot Villanueva was because he feared for his own life. In explaining his mental state at the time of the shooting, [Petitioner] did not describe any passion or other extreme emotion beyond the panic and fear that he felt because he believed Villanueva was going to kill him. Because there was no substantial evidence to support a finding that [Petitioner] "'actually, subjectively, kill[ed] under the heat of passion,'" rather than in reasonable or unreasonable self-defense, the trial court had no duty to instruct the jury on voluntary manslaughter under a heat of passion theory. (*People v. Moye*, *supra*, 47 Cal.4th at p. 554.)

[LD at 15-18.]

Finally, the California Court of Appeal concluded that any instructional error in this respect was harmless, "because it is not reasonably probable that [Petitioner] would have obtained a more favorable outcome if the jury had been so instructed."

17

1  [LD 6 at 18.]  The state appellate court reasoned that, in "finding [Petitioner] guilty
2  of second degree murder, the jury necessarily rejected his account that he shot
3  Villanueva based on an actual or perceived need to defend himself."  [*Id.*]  "[O]nce
4  the jury in this case rejected [Petitioner's] claims of reasonable and unreasonable
5  self-defense, there was no reasonable probability that it would have found
6  [Petitioner] guilty of voluntary manslaughter based on heat of passion even if it had
7  been instructed on that theory.  [Petitioner] therefore has failed to show prejudicial
8  instructional error."  [*Id*. at 19.]

9

10  **II.    The *Teague* Issue**

11  Respondent argues that Petitioner's claim is barred by *Teague v. Lane*, 489
12  U.S. 288 (1989).  In *Teague*, the Supreme Court held that a new constitutional rule
13  of criminal procedure announced after a defendant's conviction became final cannot
14  be applied retroactively on federal habeas review, unless the new rule forbids
15  criminal punishment of "certain kinds of primary, private individual conduct" or is a
16  "watershed" rule of criminal procedure.  *Teague*, 489 U.S. at 311-12 (citation and
17  internal quotation marks omitted).  *See also Edwards v. Vannoy*, 141 S. Ct. 1547,
18  1551 (2021) ("This Court has repeatedly stated that a decision announcing a new
19  rule of criminal procedure ordinarily does not apply retroactively on federal
20  collateral review.").  "[A] case announces a new rule when it breaks new ground or
21  imposes a new obligation on the States or the Federal Government" or "if the result
22  was not dictated by precedent existing at the time the defendant's conviction became
23  final." *Teague*, 489 U.S. at 301.

24  In *Beck v. Alabama*, 447 U.S. 625, 638 (1980), the Supreme Court held that
25  the failure to instruct the jury regarding a lesser included offense in a capital case
26  violates the Due Process Clause if there was evidence to support the instruction.
27  The Supreme Court, however, expressly declined to decide whether due process
28  requires that such an instruction be given in a non-capital case.  *Id.* at 638 n.14.  The

18

Ninth Circuit has declined to find a constitutional right to a lesser included offense instruction in non-capital cases and, further, has held that a state court's failure to instruct on a lesser included offense in a non-capital case does not present a federal constitutional question and, thus, does not provide a basis for federal habeas relief. *See Solis v. Garcia*, 219 F.3d 922, 929 (9th Cir. 2000); *see also Windham v. Merkle*, 163 F.3d 1092, 1105–06 (9th Cir. 1998); *Turner v. Marshall*, 63 F.3d 807, 819 (9th Cir. 1995), overruled on other grounds by *Tolbert v. Page*, 182 F.3d 677 (9th Cir. 1999); *Bashor v. Risley*, 730 F.2d 1228, 1240 (9th Cir. 1984).  The Ninth Circuit also has held that the principles enunciated by the Supreme Court in *Teague* preclude granting federal habeas relief based on a failure to give a lesser included offense instruction in a non-capital case.  *Solis*, 219 F.3d at 929; *Turner*, 63 F.3d at 819.

The Court is aware that the Ninth Circuit has found that a trial court's refusal to instruct the jury regarding a lesser included offense, when requested by the defense, may violate due process if it deprives a defendant of his right to present a defense.  *See Bashor*, 730 F.2d at 1240; *Solis*, 219 F.3d at 929.  A claim of that nature would not be *Teague*-barred given that the Ninth Circuit's decisions so finding predate Petitioner's conviction.  *See Butler v. Curry*, 528 F.3d 624, 635 n.10 (9th Cir. 2008) ("In determining whether a rule is 'new' for Teague purposes, we may also consider our own case law."); *Leavitt v. Arave*, 383 F.3d 809, 819 (9th Cir. 2004) (*per curiam*) ("'circuit court holdings suffice to create a "clearly established" rule of law under *Teague*'") (citation omitted).  The Petition, however, does not allege any such deprivation of the right to present a defense theory, nor did Petitioner assert and exhaust such a theory in the state courts.  Moreover, at trial, Petitioner did not request an instruction on voluntary manslaughter based on a heat of passion theory and, instead, only posited that such an instruction was applicable for the first time on appeal and that the trial court should have given it on a *sua sponte* basis.  Rather, at trial, Petitioner's theory – argued vigorously to the jury and

as proffered through Petitioner's testimony – was that he acted in self-defense and therefore was not guilty of homicide at all.

In short, Petitioner never claimed at trial that he could be found guilty of voluntary manslaughter pursuant to a heat of passion theory, and thus, he was not deprived of any right to present a defense he never urged by reason of the trial court's failure to instruct, *sua sponte*, on such a theory.  There is no Supreme Court or Ninth Circuit authority to support application of the deprivation of the right to present a defense exception to *Teague* in <u>this</u> case.  *See Bashor*, 730 F.2d at 1240 (stating that even assuming a failure to give lesser included offense instructions could violate a defendant's constitutional rights, no violation occurred when defendant never requested such instructions).  This simply was not an instance of a failure to instruct on a defendant's theory of defense, and this case does not fall within the ambit of the foregoing Ninth Circuit decisions.

Under present law, granting habeas relief on Petitioner's claim would require announcement of a new rule.  The two historical exceptions to *Teague* are inapplicable, because the rule urged by Petitioner would not place conduct beyond the reach of criminal law or decriminalize any class of conduct, and it is certainly not a "watershed" rule.  Accordingly, the claim raised by Petitioner is *Teague*-barred.

### III.   The Failure To Instruct On Heat of Passion And Voluntary Manslaughter

Even if the claim raised by Petitioner was not barred by *Teague*, it nonetheless would fail, because he has not met the showing required by Section 2254(d)(1) with respect to the state court's decision rejecting the claim on its merits. There are two reasons why federal habeas relief is foreclosed.

First, as discussed above, there is no Supreme Court authority holding that a defendant has a constitutional right to a jury instruction on a lesser included offense

in a *non-capital* case, especially when he never sought such an instruction or pursued such a theory.  The lack of clearly established Supreme Court precedent dooms Petitioner's claim under Section 2254(d)(1), because it cannot be said that the California Court of Appeal's rejection of this claim was contrary to, or an unreasonable application of, clearly established Supreme Court law when no clearly established law exists.  See *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) (holding that "it is not 'an unreasonable application of clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by this Court"); *Wright v. Van Patten*, 552 U.S. 120, 123 (2008) (*per curiam*) ("Because our cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonabl[y] appli[ed] clearly established Federal law.") (internal citation and quotation marks omitted).  As a result, the Petition necessarily fails under Section 2254(d)(1).

Second, regardless of the AEDPA requirements, even in capital cases, a defendant is not entitled to a lesser included offense instruction unless the evidence warrants it.  *See Hopper v. Evans*, 102 S. Ct. 2049, 2053 (1982).  The California Court of Appeal recognized this principle and rejected Petitioner's contention that the evidence supported a voluntary manslaughter/heat of passion instruction, finding that there was no evidence to support applying the theory, whether based on the Petitioner learning from his wife of the affair and the victim's behavior and threats (which Petitioner label's the victim's "continuing provocations") *or* what happened at the time of the shooting itself.  Both findings were objectively reasonable.

With respect to the evidence of the victim's "continuing provocations," the California Court of Appeal found that, under California law, this evidence was not sufficient to establish that Petitioner was acting in the heat of passion five days after he learned of such prior behavior by the victim.  Whether or not California law is satisfied by the evidence presented is a state law question, and this Court must defer

21

1    to the state court's resolution of that state law question.  *See Bradshaw v. Richey*,

2    546 U.S. 74, 76 (2005) (*per curiam*) ("a state court's interpretation of state law,

3    including one announced on direct appeal of the challenged conviction, binds a

4    federal court sitting in habeas corpus"); *Hicks v. Feiock*, 485 U.S. 624, 629-30 & n.3

5    (1988) (interpretation of state law by state court, including interpretation announced

6    by intermediate appellate court, binds federal court in habeas proceedings).  The

7    Court simply cannot grant federal habeas relief based on Petitioner's contention that

8    the state court erroneously applied California law.  But even without according this

9    required deference, the state court's decision was amply reasonable objectively.

10        The jury instruction Petitioner claims should have been given – CALCRIM

11   No. 570 – would have told the jury as follows:  "If enough time passed between the

12   provocation and the killing for a person of average disposition to 'cool off' and

13   regain his or her clear reasoning and judgment, then the killing is not reduced to

14   voluntary manslaughter on this basis."  Five days passed between when Petitioner

15   was told about the victim's earlier behavior and threats and when he shot the victim.

16   Nothing in Petitioner's trial testimony could support a finding that he shot the victim

17   because he was in the grips of a five-day-long heat of passion state, *to wit*, that for

18   five days, he had been experiencing "an emotion so intense that an ordinary person

19   would simply react, without reflection" and an "anger or other passion [] so strong

20   that [his] reaction bypassed his thought process to such an extent that judgment

21   could not and did not intervene."  *People v. Beltran*, 56 Cal. 4th 935, 949 (2013).

22   Rather, Petitioner testified that:  as he sat in his car, he began to be worried and

23   nervous about why the victim had stayed in his vehicle while his friend Castro got

24   out of the car; Petitioner wanted to "talk it out" and "squash with" the victim,

25   because "the problem is still going to be there" if he did not and he did not want to

26   live his life looking over his shoulder; he made the decision to try to resolve the

27   situation by talking to the victim; and when he went over to the victim's car, he did

28   not intend to shoot the victim.  [RT 2150-52.]  According to Petitioner, he did not

experience any intense emotion until after he arrived at the victim's car and saw what he thought was a gun in the victim's hand, which then caused Petitioner to fear for his own life. As Petitioner put it, he would not have shot the victim if he had not seen the victim take a gun out of the car's console, and "[t]he only thing that caused me to shoot him was fear, that he was about to shoot me." [RT 2153, 2217.] Petitioner's own testimony, thus, negated any basis for finding that he was acting in an ongoing heat of passion state that commenced five days earlier and still remained in effect when he exited his car and went over to the victim's car. The state court 's conclusion that the five-day period was ample time for Petitioner's "passion" to subside and that it, in fact, it actually had subsided – as shown by his own testimony – plainly was reasonable.

The California Court of Appeal also reasonably found that the heat of passion theory did not apply to the events of the shooting itself. Petitioner claimed that he walked over to the victim's car intending only to talk to him, and Petitioner did not claim that he was experiencing fear or other intense emotion at that moment, but instead, only was worried or nervous. Petitioner testified that when he saw the victim reach for a gun, he felt fear and panic that he might die, due to the look on the victim's face and the prior threats made by the victim, which in turn caused him to shoot the victim, *i.e.*, he shot the victim because he was "scared." [RT 2153-54, 2157.] As Petitioner described it, he felt he had no choice but to shoot the victim, stating that he knew it was "not right to take someone's life[, B]ut what is there to do when you're about to get your life taken?" [RT 2156.] In short, Petitioner testified that, in that moment, he believed the victim was going to kill him so he shot first, to protect his own life – a classic claim of self-defense. Petitioner's testimony certainly supported instructing the jury on self-defense and imperfect self-defense, and the jury was so instructed, but it did not support a heat of passion instruction and the trial court did not err in failing to give such an instruction on a sue sponte basis.

23

The California Court of Appeal's decision is entitled to deference.[5]  Its characterization of the evidence at trial is eminently reasonable, and in any event, Petitioner has not disputed it.  Given Petitioner's own testimony, there simply was no basis in the record to support a voluntary manslaughter based on heat of passion instruction.  Petitioner had no due process right to a jury instruction unsupported by the evidence.  *See Hopper*, 456 U.S. at 611 (in the capital case context, "due process requires that a lesser included offense instruction be given *only* when the evidence warrants such an instruction"); *Solis*, 329 F.3d at 929 (no right to a voluntary manslaughter instruction when the evidence did not support it); *see also Menendez v. Terhune*, 422 F.3d 1012, 1029 (9th Cir. 2005) (due process cannot be violated if the omitted instruction is not supported by the trial evidence).

The claim raised by Petitioner presents no basis for federal habeas relief even if it were not *Teague*-barred, and it is foreclosed by Section 2254(d)(1). Accordingly, the Petition must be denied.

## ORDER

For all of the foregoing reasons, the Court concludes that the Petition does not merit federal habeas relief.  Accordingly, IT IS ORDERED that:  the Petition is denied; and this action is dismissed without prejudice.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

DATED:  June 7, 2022

_____
GAIL J. STANDISH
UNITED STATES MAGISTRATE JUDGE

---

[5]     Given the Court's conclusion that the state court reasonably found that no due process violation occurred, the Court need not address the state court's additional finding of harmless error.